IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**UNITED STATES OF AMERICA,**

**v.**  **CRIMINAL ACTION NO. 2:17cr123**

**JUSTIN STAHMER,**

**Defendant.**

*MEMORANDUM OPINION AND ORDER*

Before the Court is Defendant Justin Stahmer's Motion to Suppress. Defendant filed a Memorandum in Support of his Motion, ECF No. 12, and the Government filed a response, ECF No. 13. Defendant did not file a reply. Defendant seeks to suppress Defendant's statements allegedly made to Coast Guard personnel and law enforcement on or about June 20, 2016. On October 27, 2017, the Court held a hearing on this matter and denied Defendant's Motion from the bench. ECF No. 19. This Order further explains the Court's rationale. For the reasons discussed below, Defendant's Motion to Suppress is **DENIED**.

### I. FACTUAL AND PROCEDURAL HISTORY

On the evening of June 20, 2016, at about 9:10 p.m., the Coast Guard Sector Hampton Roads received a call on the VHF radio frequency 16 (channel 16) from the vessel Sully Girl. Shortly after the first call, Sully Girl reported a mumbled message on channel 16 stating that he had "no cell phone, man over board, no GPS and fish finder." The Coast Guard interpreted the call to mean that there may be a person in the water in distress and both the Hampton Roads and North Carolina Coast Guard Sections began repeated attempts to hail the vessel Sully Girl to learn its position and determine the nature of the emergency.

At 9:59 p.m., the Sully Girl said "mayday mayday" on channel 16. When the Coast Guard approached, the Sully Girl had all of her lights out. At that time, Defendant did not indicate any distress to the Coast Guard by shining his onboard flashlight, hailing, or waiving down the Coast Guard. The Coast Guard then asked standard questions to determine if they had found the vessel reporting distress. At first, Defendant denied making a distress call but did not object to a boarding team embarking upon the vessel. After initial contact with Defendant, two members of the boarding team conducted an initial sweep of the vessel to ensure it was seaworthy and there were no obvious hazards. It is standard operating procedure to conduct a sweep of the vessel to ensure the safety of those onboard the vessel, other mariners in the area, and the boarding officers themselves. After the vessel was deemed safe, the boarding team proceeded with their initial standard boarding questions to understand the basic nature of the situation. During these foundational questions, Defendant denied making any distress calls; however, Defendant eventually stated that he was out of gas and had called "mayday."

At about 10:23 p.m., Defendant randomly fell overboard. The boarding team suspected that Defendant was intoxicated after Defendant fell overboard, combined with the presence of empty beer cans on the vessel, slurred speech, smell of alcohol, and failure to follow instructions. The boarding officers tried to conduct a field sobriety test, but Defendant refused to cooperate. Defendant became belligerent, uncooperative, and ultimately confrontational. Because of this behavior, Defendant was placed in handcuffs for boarding officer safety. The Virginia Marine Resource Commission Police ("VMRC") came to take Defendant into custody on suspicion of boating under the influence while the Coast Guard towed his boat to the pier. While in VMRC's custody, Defendant made a variety of spontaneous statements to Officer Mitchell, the Coast Guard boarding officer. Defendant was never read his *Miranda* rights while transiting ashore

2

because "it was noisy on the forward part of the boat." Instead, Defendant repeatedly made unsolicited threats to Petty Officer Mitchell. He made statements such as, he would "take him out" if Defendant ever saw Mitchell again; and stated that Defendant knew people in the "Buckroe Boys" who would "take care" of Mitchell. Mitchell, an African American, knew the Buckroe Boys were a local, criminal gang with a reputation of involvement in racial hate crimes in Hampton, Virginia. When approaching the marina, Defendant was advised of his *Miranda* rights by Marine Police Officer Bryant Stephens. Defendant was then transported to the Norfolk City Jail.

On August 10, 2017, Defendant was indicted on three counts (two counts of Communicating a False Distress Signal and one count of Threatening a Federal Law Enforcement Officer). On September 1, 2017, Defendant pled Not Guilty before Judge Krask and was released on an unsecured bond. Defendant's Motion to Suppress was filed on September 22, 2017. The Government's Response was filed on October 5, 2017. Defendant did not file a reply. The Court held a hearing on the Motion to Suppress on October 27, 2017. The Jury Trial is set for November 7, 2017.

## II. LEGAL STANDARD

In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law. *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005) (citations omitted). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir. 1993); *see United States v. Massey*, 257 F. App'x 662, 664 (4th Cir. 2007); *Columbus-Am. Discovery Group v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir.

1995). As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his suppression motion, the burden shifts to the government. *United States v. Matlock*, 415 U.S. 164, 177-78 n.14 (1974).

## III. DISCUSSION

### A. Whether Defendant Reasonably Believed He was in Custody at the Time of His Statements to Coast Guard Boarding Officers.

At the time of Defendant's statements to the Coast Guard Boarding Officers, Defendant could not have reasonably believed he was in custody.

*Miranda* warnings are required before law enforcement may properly engage in any custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Specifically, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* "The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* If law enforcement does not administer *Miranda* warnings before they question a person in custody, evidence resulting from the questioning must be suppressed. However, "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

Whether a suspect has voluntarily, knowingly, and intelligently waived his rights under *Miranda* is examined by the "totality of the circumstances surrounding the interrogation." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005). The Fourth Circuit has articulated a two-step inquiry. First, a court must

4

find that "the relinquishment of the right 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception,'" United States v. Shanklin, No. 2:12CR162, 2013 WL 6019216, at *3 (E.D. Va. Nov. 13, 2013) (quoting United States v. Cristobal, 293 F.3d 134, 139 (4th Cir. 2002)). Second, the district court must find that the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Id. (quoting Cristobal, 293 F.3d at 140). When analyzing the totality of the circumstances, courts have considered such factors as the suspect's "intelligence and education," his "age and familiarity with the criminal justice system," and "the proximity of the waiver to the giving of the Miranda warnings." Poyner v. Murray, 964 F.2d 1404, 1413 (4th Cir. 1992).

During the hearing, Defendant argued that all statements made by Defendant should be excluded because they were obtained without advising Defendant of his Miranda rights before Defendant subjected himself to custodial questioning. Defendant also contended that he could have reasonably believed that he was in custody because his freedom of action had been curtailed to a significant degree when the officers boarded the vessel before arresting Defendant for boating under the influence. Defendant stated that a reasonable person in his position would have interpreted his situation to be one of custody. Secondly, Defendant argued that any statements Defendant made after he was advised of his Miranda rights should also be suppressed. The statements should be suppressed because Defendant could not have made a knowing and intelligent waiver of his Miranda rights because Defendant was intoxicated.

The Government argued that Defendant could not have reasonably believed that he was in custody at the time he made statements concerning whether he was in distress and had made a "mayday" call. Government contended that the Coast Guard Boarding Team was operating in

5

their capacity as search and rescue professionals based on their first contact with the accused over the VHF radio, through the initial phase of the boarding, and up to and including the point which Defendant fell overboard. At that point, the Coast Guard Boarding Officers had no indication or belief that any crime had occurred and were not conducting any sort of criminal investigation. Their initial contact with Defendant and questioning was to ensure his safety, their safety, and the safety of anyone else in the area. Most importantly, Defendant consented to officers boarding his vessel. The Government stated that Defendant was not placed in custody until after he was placed in handcuffs and the boarding team contacted the VRMC to formally arrest him.

The Government also argued that although Defendant was under arrest at the time of his threats to Officer Mitchell, Mitchell's role was limited to ensure Defendant's safety on the boat as he never questioned Defendant or engaged in any conversation with Defendant. Rather, the Government made note that Defendant repeatedly kicked Petty Officer Mitchell's legs during the boat ride and directed racially motivated threats towards Mitchell. These threats were the product of spontaneity and not the result of any formal questioning by law enforcement.

The Court finds that the Coast Guard did not violate Defendant's *Miranda* rights because Defendant was not in custody prior to being placed in handcuffs by officers. Defendant was not in custody for purposes of *Miranda* when the Coast Guard first encountered Defendant on the vessel at the time he made statements relating to his distress calls. Defendant's freedom of movement was not restrained to the extent of a formal arrest because the facts show that there were no display of weapons, officers' communications with Defendant were to assist with a potential emergency in the water, there was no physical contact with Defendant until he fell overboard, and Defendant consented to the Coast Guard coming onto Defendant's vessel.

Secondly, the Court finds that the threats Defendant made to Officer Mitchell while in custody are admissible in trial because Defendant's threats were spontaneous and not in response to police questioning. The important point in assessing the admissibility of the threats is to take into consideration that Officer Mitchell was not questioning or interrogating Defendant while he was in custody. Officer Mitchell's sole purpose of interacting with Defendant was to ensure Defendant's safety, not to question Defendant or engage in conversation with Defendant.

Thus, the Court finds that all statements and threats made by Defendant are admissible at trial.

## B. Whether the Line of Questioning was Designed to Elicit Incriminating Reponses or Fell Under the Public Safety Exception to *Miranda*.

The Coast Guard Boarding Officers' line of questioning was not designed to elicit incriminating responses from Defendant, but was designed to ensure the public safety of the officers, Defendant, and the vessel itself.

A custodial interrogation violates *Miranda* when the questioning might reasonably elicit an incriminating response. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also United States v. Allen*, 13 F.3d 105, 109-10 (4th Cir. 1993) (using the "reasonably likely to elicit an incriminating response" test). If an investigator's questioning is designed to elicit an incriminating response, it will survive judicial scrutiny if the purpose of the questioning is driven by concerns for public safety. *New York v. Quarles*, 467 U.S. 649, 657 (1984) (explaining that there is an exception to *Miranda* in situations where police officers need to quickly obtain information from suspects to protect public safety). "The need for answers to questions in a situation posing a threat to public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.*

Defendant argued that the Coast Guard police officers' line of questioning to Defendant were designed to elicit an incriminating response because they were asked with the sole purpose of getting Defendant to admit that he made false radio distress calls that night. Any statements made by Defendant should be suppressed because Defendant was in custody and subject to express questioning designed to elicit incriminating responses without being read his *Miranda* rights during initial questioning and after being transferred to the Coast Guard boat.

The Government argued that the Coast Guards' questioning of Defendant did not violate *Miranda* because the questioning was designed to determine the nature of the emergency situation and not designed to elicit an incriminating response. The Government further contends that the line of questioning fell under the public safety exception to *Miranda* and was important questioning for public safety concerns. For example, the Coast Guards' line of questioning included "are you the vessel that called mayday" and "do you know if anyone is in the water."

The Court finds that the Coast Guards' line of questioning fell under the public safety exception to *Miranda* and not designed to elicit incriminating responses. Similar to the rationale in *Quarles*, the Coast Guards' line of questioning was designed to identify and reduce threats to public safety. All of the actions taken by the Coast Guard were geared towards determining whether they were on the right vessel and if a distress situation existed. Most importantly, the actions of the Coast Guard were not conducted for the purpose of obtaining evidence to prosecute Defendant for a crime nor to incriminate Defendant with a crime. Therefore, the safety of persons in the water, safety of persons on the boat, or safety of the vessel falls within the purview of public safety.

Thus, the Coast Guard Boarding Officers' line of questioning was not aimed at eliciting incriminating statements, and therefore fell under the public safety exception to *Miranda*.

## CONCLUSION

The Court finds that Defendant's *Miranda* rights were not were violated because Defendant was not in custody prior to officers placing Defendant in handcuffs when transporting Defendant to shore. Even after Defendant was formally placed in custody, Defendant's threats to Officer Mitchell were the result of spontaneity and not express questioning from officers. Lastly, the Coast Guard's line of questioning prior to Defendant's formal arrest fell under the public safety exception of *Miranda* because the Coast Guard's purpose of questioning Defendant was to ensure public safety of the vessel and persons in and out of the water, not for purposes of eliciting incriminating responses from Defendant. For the reasons stated above, it is **ORDERED** that Defendant's Motion to Suppress is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to Defendant and the United States Attorney.

**IT IS SO ORDERED.**

Norfolk, Virginia
November 6, 2017

/s/
Raymond A. Jackson
United States District Judge